We have four argued cases today. The first is number 18-1285, Purdue Pharma L.P. v. Iancu. Mrs. Swise, is that how you pronounce it? Good morning, your honors. It's actually Sweezy. Sweezy, okay. I tried. It's not the way it looks. I would not expect that. Good morning, your honors. May it please the court, Jennifer Sweezy on behalf of Purdue, the patent donors and appellants in these IPRs. The board in these IPRs made two fundamental errors that I would like to focus on this morning. Before you get into the merits of your argument, I have a couple of very quick questions by way of background. The first question is the version of OxyContin that is commercialized now, does that practice this patent? Yes, it does. So that's a product that is prepared with heating the magnesium stearate with the core matrix? Yes. And would you say that a product that does not heat the magnesium stearate with the core matrix would not infringe? Yes, your honor. Under the proper construction of the claim, all three components, and that's the first issue I do want to talk about is claim construction, all three components have to be together for the core matrix to be heated. So if somebody produced a product that did not heat the magnesium stearate with the core matrix, you would have no infringement case? That's right. It's certainly under the broadest reasonable interpretation which applies in these proceedings. So what does the record reflect about the benefits of heating the magnesium stearate as part of the patent? The record shows that no one would have thought to do this. No, I'm talking about it in terms of the patented invention. You say the patented invention requires this. What does the patent say that the benefits of heating the magnesium stearate are? Yes, your honor. The benefit is an abuse deterrent formulation that uses these particular ingredients. That doesn't really answer my question. My specific question is what does the patent say or what does the record say about the benefits of heating the magnesium stearate? The patent, by claiming these abuse deterrent formulations, reflects that the process of heating, which of course changes the chemical formulation, by doing the heating to all three of these does impart an abuse deterrent formulation as reflected in our product. But why? What is the benefit, according to the patent, of heating the magnesium stearate as opposed to making the formulation? As I understand it, magnesium stearate is a lubricant that helps you make the tablets. What's the benefit of heating it? The benefit of heating it is that it pulls all of these ingredients together in such a way that they cannot be pulled apart by an abuser. They wouldn't be able to extract solely the active ingredient, the oxycodone, the active ingredient. Well, that's the benefit of mixing them together, but where does it say there's a benefit to heating? The benefit to heating, the claims require that, and as a chemical matter, and I'm not sure that I can explain this myself, but the process of heating those three components together creates the kind of matrix, the kind of... Okay, well, did your expert or did one of the experts say that there's a benefit to heating the magnesium stearate? I believe so, Your Honor. I can check and address that. Where do we find that? I can see if we can... Let me see if I can locate that for you. It wasn't an issue on appeal, so I don't think it's relevant to the construction of the claims because, of course, the claims define... Maybe it is, because also, I don't see that the patent specification really discloses, aside from your interpretation of the claim language itself, I don't think the specification discloses an embodiment in which the magnesium stearate is heated. In fact, the... What is it? Example 6 discloses adding it after the heating is completed. In fact, I think all the examples that include magnesium stearate show magnesium stearate being added after the cooling. Isn't that right? That's true, and we don't dispute that, but, of course, a patent doesn't have to practice every claim, and examples are just examples. Right, but if your position is that what's really distinctive about this patent and what's really important to its efficacy is that the magnesium stearate is heated with the core matrix, then it's hard to square that with the fact that every single example that uses magnesium stearate has the magnesium stearate after the cooling. So, a couple of responses to that. First, our specification does disclose this embodiment. It's not in an example, but it is disclosed in the specification. Is this just column 17? Yes. Wow. Okay. It does disclose the embodiment, and, of course, examples do not limit the claims. The claim couldn't be anywhere near... Well, when it only discloses the example, is this in column 17 line 8? This is given... The logenous mixture is then heated to a temperature sufficient? That's what you say discloses it? Yes, Your Honor, because that passage in column 17 talks about combining an opioid, analgesic, and an aversive agent, which has been previously defined to include PEO. And then, in that same column at lines 37 through 42, we say that other pharmaceutical incipients, such as a lubricant, which has been defined to include magnesium stearate, can be included in that matrix formulation. But it doesn't refer there to the timing of the heating, as I read it. The prior passage talks about a heated composition. Right, but at that point, you aren't talking about the inclusion of magnesium stearate, right? Your reference at the top of column 17 to heating, and as a reference in the middle of 17 to adding the magnesium stearate, I don't see where this column reflects, or at least clearly reflects that the magnesium stearate is in fact heated. It does, Your Honor, because at the beginning of 17, it says we're talking about the preparation of a suitable melt-extruded matrix. And that's the first sentence of the 18. And it says it may include the opioid and an aversive agent. And then further down in column 17, it refers specifically to the sustained-released matrices of the present invention, which is a reference and certainly discloses that magnesium stearate can be included. And of course, there's the claim language itself, which is for claim construction the starting point. So if I can address that issue, as well as what the Board mistakenly read for its improper construction. Do you have a reference to us about the benefits of heating the magnesium stearate? I will see if I can locate that for rebuttal, Your Honor. Okay. I apologize for not having that right now. What I can tell you is that nobody thought to do that. And we don't necessarily have to explain in a patent all the whys, but we do have to provide, the patent has to claim something that is novel and non-obvious. Well, maybe in terms of interpreting the patent, if there's no benefit to it, then maybe you're less likely to interpret it as being required. Respectfully, Your Honor, those are I believe, conflating different issues. Of course, 112 issues are not at play in an inter-parties review, and we do believe that the claim construction itself, along with consistent agreement throughout these proceedings, supports our construction. This wasn't debated. It wasn't a dispute that the core matrix has to include these three ingredients, and then that core matrix has to be heeded. That wasn't a dispute. And I'd like to take the Court specifically to the parties' stipulation, because that is where the Board got off on the wrong foot on this issue. You're talking about the email from August 10th, 2017? Yes, Your Honor. Appendix 8938. And the parties were asked by the Board to put in writing an agreement that they made clear at the oral hearing that this is what the claim means. Again, they weren't even disputing the whys or the benefits, but simply looking at the plain language, and given the consistent testimony from the experts about what this claim means, they agreed to that before the Board at the oral hearing, and then they put this in writing at the stipulation. The Board misread the stipulation. The stipulation hinges, and I can make four brief points, it hinges on the term, the core matrix, which the parties defined as a blended mixture having three ingredients. That's the second full paragraph. In the third full paragraph, they then use that term, this is my second point, they define heeding the core matrix as necessarily predicated on what the core matrix is, those three ingredients combined. There is a final sentence, this is my third point, that the Board read as eviscerating those two prior agreed upon statements. In the final sentence, the Board says that it doesn't mean heeding the core matrix, but you can heed just one ingredient. That's how they read this, but that is not what that final sentence says. The final sentence being the one that starts, heeding occurs at any time during the preparation? Yes, Your Honor. That final sentence is simply talking about when heeding can occur once you have the three blended ingredients together. It cannot be read in isolation from the two prior agreed upon statements that one, the core matrix is these three ingredients, because in that paragraph they use and, all three ingredients define the core matrix. And then in the second paragraph, heeding the core matrix is heeding that blended mixture, which they again define as those three ingredients. And perhaps this is reading with too much of a jeweler's eye, a sentence that was perhaps not crafted terribly well, but if your position is correct, why wouldn't that sentence have simply said heeding occurs at any time after preparation of the blended mixture? It's the during that causes you a problem, it seems to me, because during the preparation  reasonably encompass, it would seem to me, before you've added all of the components of the mixture. Isn't that right? No, Your Honor. Let me give you a few reasons. First, because it can't be read in isolation from these two prior agreements that you have those three ingredients. A core matrix doesn't exist unless you have all three of those ingredients together. What that passage is doing is recognizing under the broadest reasonable interpretation, we weren't going to be so draconian as to say, you're going to entirely blend the mixture without any heeding whatsoever, and that all heeding is entirely thereafter. We recognized, frankly, a very sort of, perhaps metaphysical, minor situation where you might be blending and heeding at the same time, and so it's simultaneously blending, you have the blended mixture, you're also heeding, you're therefore heeding the blended mixture. But you cannot read that sentence, particularly in light of the two prior agreements and the consistent testimony by the experts in this case and the claim language, as somehow now allowing heat to be applied to only one ingredient. Before we run out of time, let's try the questions on this point. Let me ask you to talk about McGinnity and why it's not appropriate to interpret McGinnity as allowing the heeding of magnesium stearate as part of the process disclosed there. Your Honor, our best evidence on that is Dr. Timko Amniel's expert, who clearly said that McGinnity, Palermo, and no other reference would teach, and this brings me back to the conversation we were having at the beginning, that nobody thought to do this. Nobody thought to add magnesium stearate. Well, that's just sort of a generalized statement, but there's specific language in McGinnity which seems to say that lubricant can be included in what's heated as long as it's not inconsistent with the process, or some language like that. Where do we find McGinnity in here? What is the page number? In appendix 4830 through 4835, I can read the Court two specific passages in paragraph 44. This is 4830. This is Dr. Timko's report. No, but I was asking you where McGinnity was. Oh, I'm sorry, Your Honor. McGinnity is at in the passage the Court is referring to is on page 13, which is at appendix 512. The problem here is that the Board took its own exercise of evaluating McGinnity, which of course is not from the perspective of a person of ordinary skill in the art, and was contrary to the evidence in this case, and this Court has been clear They have expertise in interpreting prior art. Where is this? McGinnity is 478, 479. I have it at 512, Your Honor. It's at the top of page 480, right? In addition to the above ingredients, the sustained release matrix incorporating melt-excluded multi-particulates may also include suitable quantities of other materials, e.g. lubricants, right? So, did your expert address that language in McGinnity? Yes, our expert and Anmuel's expert both said you couldn't read the prior art wouldn't teach this. Now, my question is, did they address that language in particular? So, Your Honor, I think I'm sorry, if you could I think we might be looking at different... It's at the top of 480. 480. The first paragraph. Yes, Your Honor. So, that... The experts looked at McGinnity and Dr. Timko said... My question is very specific. Did the expert either of the experts address that language and tell us how that language should be interpreted? They addressed McGinnity as a whole. Not that language. I don't know that... I think that their conclusion was that nothing in McGinnity, because nothing in the prior art See, my time is out, Your Honor, but to answer this question, they did not find anything in McGinnity and that can be found in paragraphs 44 and 4835 of the appendix. Nothing in the prior art thought about using or would have thought to use magnesium steroid in a hot melt extrusion because of the significant concerns and problems, the unworkability of that formulation. What do you mean the unworkability of it? That magnesium steroid has incompatibilities with oxycodone and with heat. And combining all of those together, nobody in the art thought that that would be... Where do they say that it's incompatible with heating? They... As simple as the handbook for pharmaceutical excipient says that, our expert relied on that. I'm asking you where? Where do I find the testimony or the excerpt from the handbook saying that you can't heat the magnesium lubricant? Your Honor, that is at in the... The handbook itself is at appendix 4661 4661? Yes, there are other references at 4669 Well, wait, wait. Okay, 4661 Okay. So where does it say that? It specifically says, it has a section describing magnesium steroid that it is incompatible with oxycodone and talks about the concern... Okay, but that's not what we're talking about. We're talking about heating. It talks about on page 4661 in section 19 comments that magnesium steroid is sensitive to mixing time and that blend... This is the final sentence on page appendix 4661. Blending times with magnesium steroid should be carefully controlled. Yeah, but that's not my question. My question is where does it say you shouldn't heat it? That is expressly said by both experts in this case. Where? Just give me one example. Dr. Timko, 4829 4829? Yes. Okay. Through 4835. Okay, where does he say you shouldn't heat it? In paragraph 42 on 4829 about halfway down he says the Senate's starting nothing. Nothing in McGinnity suggests adding magnesium steroid to the HME, which is the hot melt extrusion process used by McGinnity and he says two sentences later and knowing what a person of ordinary skill in the art would know about the decades old handling issues of magnesium steroid no other interpretation of McGinnity is justified. Where does he say it shouldn't be heated? That's what he's saying in this paragraph. The hot melt extrusion is the heating process in McGinnity and he is saying that nothing in McGinnity taught and a person of ordinary skill in the art would not think or would want to add magnesium steroid to that hot melt extrusion process. He again says similarly in paragraph 43, a person of ordinary skill in the art would have had no reason to try to include magnesium steroid in the core of a hot melt extrusion formulation. He's quoting us and he says on the next page that is absolutely true. There is no reason to include magnesium steroid in the hot melt extrusion itself. Okay, that's different from saying it would be harmful to do it. And I don't believe harmful is the test, Your Honor. The obviousness inquiry is whether a person of ordinary skill in the art would have been motivated to combine these ingredients in the manner claimed. And Dr. Tymko, Ammiel's expert, is expressly agreeing that when the claim is properly construed as requiring the heat applied to the core matrix, all three ingredients, no person of ordinary skill in the art would have thought to do that. Anything else? Okay, we'll give you two minutes for a follow-up. Ms. Craven? Good morning, Your Honor. May it please the Court. McGinnity and Palermo teach adding magnesium steroid to a dosage form in the identical manner as a 976 patent. It's an additional component that can be added to a hot melt extruded dosage form. Therefore, the Board didn't err in finding the claims obvious under either of the claim constructions. So the Board construed the core matrix is heated based on the stipulation, which is similar to statements in the prosecution history, and importantly, in light of the specification, and found that there's no disclosure that during preparation of the core matrix necessarily had heating the magnesium steroid as part of that core matrix. Is there any place in the patent or in the expert testimony that says there's a benefit to heating the magnesium steroid? I do not recall any statements like that. I think both experts did say that one of skill in the art would understand that you would try to avoid heating magnesium steroid in a hot melt extrusion. That was the testimony from both of the experts. And I think that what's important, though, is... I'm not sure that the... I was just asking about that. Is there such testimony that you avoid heating it? Where is that? I don't know if I can point you to something that says avoid heating, but I think they were saying that an expert, one of skill in the art, reading McGinnity... Wouldn't see any benefits to it. They didn't say anything about benefits, but that they would avoid too much heating and too much shearing with the magnesium steroid. Okay, but I didn't see that testimony. I am not sure... That was my understanding generally of the testimony. I'm not sure I could point you to a particular place that says that. But I think what's important is that the disclosure in the 976 patent doesn't say that there's any way to overcome any of these problems that they said about heating the magnesium steroid. They seem to suggest that they have invented this core matrix in heating magnesium steroid, but the disclosure that they have in the 976 patent does not differ in any way from McGinnity's, which also teaches adding oxycodone and PEO hot melt extrusion and says you can add other components like a lubricant magnesium steroid. And Palermo has the identical disclosure, almost word for word. It's one of Purdue's earlier patents where it suggests making an extended release oxycodone dosage form. You can add other components to the sustained matrix and one of those would be a lubricant magnesium steroid. Specifically in the 976 patent, they pointed to magnesium steroid as a lubricant for tableting and that's something that suggests the end of the process so that the heating occurred during the formation of the core matrix. The magnesium steroid was then blended and then tableted. Blended after cooling. At some point after the extrusion process. So at some, I don't know if it's cool, all cool, some level of heat. There's no testimony one way or the other and I'm not sure. I'm thinking about the examples. I think all of the examples that have magnesium steroids specifically call out this is after the cooling process. That's true. I think all the examples do that cooling step. I think it's melt granulation that the examples use. They mix the oxycodone or the activate gradient and the aversive agent like a PEO and then cool it and add the magnesium steroid. That's all the disclosure they have in the specification and the board under the broadest reasonable interpretation construed the claim to then cover those embodiments where you would add the magnesium steroid during preparation of the core matrix. Unless there's any other questions, we'd ask this court to affirm the board's three obviousness decisions. Let me ask you about the second of the two claim construction issues. The abuse deterrent dosage issue. Why isn't that preamble language part of the requirements of the claim? I think it doesn't matter either way, but the board said it didn't. It seems to me at minimum makes your case harder if it is a required limitation. The board said it was just a statement of intended use. Because McGinnity for one thing doesn't specifically address I guess it's McGinnity doesn't address the abuse. McGinnity doesn't say specifically abuse deterrent, but it's been used as a reference in numerous abuse deterrent patents that Purdue has. But at least by its terms it doesn't bring that limitation into play. Well the board said because it's been understood to encompass OxyContin and one would understand that the OxyContin abuse problem that in fact it would look to McGinnity and then even if you then Josh teaches in fact that the PEO itself is providing abuse deterrent properties to what McGinnity is already doing. So I think even if it's a limitation, the board there's substantial evidence for the board's decision that you would start with McGinnity and it would have abuse deterrent properties the dosage form it's making. But the board said what we have is a claim body that's a structurally complete dosage form. There's no indication that the abuse deterrent in the preamble in any way changes the components of the claim. And so under this court's case without you didn't rely on the board didn't say that there's nothing in prosecution where it was relied on. So there's nothing to say that this provides any patentable way to the dosage form itself. Their argument is then the PEO, there's something about the PEO, but I don't see any teaching in their specification that suggests that there's a different amount of PEO you would use to get abuse deterrents versus non-abuse deterrents. It's a gelling agent. It would appear to deter abuse regardless of necessarily the amount or at least to some degree. Okay. Thank you, Your Honor. Ms. Sweezy, you've got a couple of minutes here. Thank you. I appreciate the additional time. In terms of your question, Your Honor, about record statements about benefits, I have to confess I don't know that it was said in those terms. What was focused on was that the prior art did not teach or suggest this combination. But of course, as I said, benefits really is not the lens from which to review whether a claim is obvious or not. And importantly, on claim construction, our claims couldn't be more abundantly clear that you have to have the thing together first before it's heated. And I would just commend the Court to the agreed upon testimony throughout this case, at least in five instances, both Ammuel's first expert and then their second expert, they continued to change their theory at the oral hearing, and our expert consistently agreed with the plain meaning of the claim that you have to have these three ingredients together before heating. You can't just have one. That's not a sensible reading, nor was it a sensible reading of the stipulation. You've mentioned now a couple of times one as opposed to all three. I take it that the PTO's position would be sustained if there were two, that is to say the PEO and the oxycodone that were heated together, but the magnesium stearate was not. Is that not correct? That's not correct. Because all three have to be heated. Well, I understand that, but what their position is, is that magnesium stearate doesn't have to be heated with the other components. Now, I take it that their position, therefore, is that the other components can be heated together. You keep saying one, only the PEO. I apologize. Let me clear up the confusion. If they are saying that you could heat the PEO and the oxycodone together and then later add magnesium stearate and then add heat... No, no, no. My point is really just a simple one for clarification. I just want to make sure that I'm on the same track as you are. The two positions are, one is that the magnesium stearate has to be part of the core matrix at the time the whole mix is heated. That's your position. At the time those three ingredients are heated. Right. The three ingredients, all of which, in your view, are part of the core matrix, all have to be heated together. That's your position. Yes. Okay. Their position is that the only thing that doesn't have to be heated as part of the core matrix is the magnesium stearate, but the oxycodone and the PEO can be heated together. Right? I believe that is their position and that is incorrect. I understand. Okay. But all I'm trying to get now is what your position is because what you said a couple of times was the... I think you said the PEO heated alone or you said... I'm not sure whether you referred to the oxycodone or the PEO. I just want to make sure you are in agreement with the PTO that their position is it can be oxycodone and PEO that's heated together as long as the magnesium stearate is not. I do understand that to be their position. Okay. That's fine. And that is contrary to the evidence because at the hearing, for instance, Amnial's Council specifically said, and this is from Appendix 8. 837, the PEO, the magnesium stearate, and the oxycodone all have to be together and heated at the same time and he agreed it's not a question... No, I understand. I understand that the expert testimony is to that effect. And that's also the Council. Excuse me, Your Honor. I understand. I understand. Okay.